UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X   Docket No.:

TIMOTHY DANIELS,

Plaintiff,

-against-                                                    **COMPLAINT**

HOFSTRA UNIVERSITY, HERMAN BERLINER,
BENJAMIN RIFKIN. and JOHN and JANE DOES 1-      **JURY TRIAL REQUESTED**
5 (said names being fictitious, the persons intended
being those who aided and abetted the unlawful conduct
of the named Defendants),

Defendants.
-------------------------------------------------------------------X

Plaintiff **TIMOTHY DANIELS,** ("Plaintiff" or "Daniels") by his attorneys,

**MADUEGBUNA COOPER, LLP**, for his complaint herein alleges:

I.      **THE NATURE OF THIS ACTION**

1.      Of all full-time faculty in degree-granting postsecondary institutions in fall 2018,

only 3% were Black males in the United States.[1]

2.      In fall 2018, of full Professors, only 2% were Black males.

3.      Studies confirm that Black students, particularly males, face harsher discipline in

public school, a racial trend that continues in the criminal justice system.[2]

4.      For example, researchers have found that Black students are nearly four times as

likely to be suspended from school as White students.[3]

---

[1] Fast Facts: Race/Ethnicity of college faculty, *National Center for Education Statistics*, *available at* https://nces.ed.gov/fastfacts/display.asp?id=61#:~:text=Of%20all%20full%2Dtime%20faculty,Black%20females%2 C%20Hispanic%20males%2C%20and

[2] Tamar Lewin, "Black Students Face More Discipline, Data Suggests," THE NEW YORK TIMES, March 6, 2012, *available at* https://www.nytimes.com/2012/03/06/education/black-students-face-more-harsh-discipline-data- shows.html

[3] Brett Arends, "Black children are more likely to be disciplined than white kids for the same behavior," MARKETWATCH, Oct 16, 2019, *available at* https://www.marketwatch.com/story/black-children-are-more-likely-

5.      At the intersection of these two sobering realities, the lack of Black faculty and harsher punishment beginning in childhood for people of color, Daniels, one of the few Black Professors at Hofstra University, was singled out for disparate treatment for student complaints about dissatisfaction with a research trip.

6.      In contrast, student complaints about White faculty are often ignored or result in no corrective action, even when the accused White professors have multiple complaints for racist or offensive behavior.

7.      Daniels, an African-American male and a practicing Muslim, is a Professor of Anthropology at Hofstra University ("HOFSTRA"), where he has been a professor since 2005.

8.      Only 4.5% of HOFSTRA's full-time faculty is Black or African-American.

9.      Of the 504 full-time faculty, Daniels is 1 of only 23 African-American or Black full-time professors, and one of only 3 Muslim professors.

10.     In June and July of 2019, Daniels led a student research trip to Malaysia, entirely paid for by a grant Daniels secured to help undergraduate students gain anthropological field research experience.

11.     During the trip, HOFSTRA received unsubstantiated student complaints stemming from cultural differences and field research realities in rural Malaysia, from students and parents expecting a fun vacation.

12.     Based on his race, color, gender and religion, HOFSTRA immediately acted on the unsubstantiated complaints, ended the trip and rushed to stereotypically judge and punish Daniels.

13.     Before even speaking with Daniels, HOFSTRA revoked his academic

to-be-disciplined-than-white-kids-for-the-same-behavior-2019-10-16; *see also* U.S. Dept. of Edu. Office for Civil Rights, Civil Rights Data Collection: Data Snapshot (School Discipline) March 21, 2014, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/crdc-discipline-snapshot.pdf

appointments and blocked Daniels from becoming Chair of the Anthropology Department, causing a loss in pay and damage to his career.

14.     Following the rush to judgment, Daniels was subjected to a formal discipline process, through an irregular and unfair hearing process that departed from HOFSTRA's formal guidelines and collective bargaining agreements, and deprived Daniels due process.

15.     These adverse acts were also taken against Daniels in retaliation because he invoked his rights under HOFSTRA's anti-discrimination policy shortly after the trip was ended.

16.     As a result of those violations, Daniels brings this action for injunctive relief, declaratory judgment and money damages to remedy discrimination and retaliation on the basis of race, color, sex and religion in the terms, conditions and privileges of employment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq*. ("Title VII"); 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section 1981") and the New York Human Rights Law as contained in New York State Executive Law, § 296, *et seq.* ("NYSHRL").

17.     Daniels contends that the terms, conditions and privileges of his employment relationship with the University were adversely affected, in part, because of his race, color, sex and religion.

18.     Accordingly, this action seeks to vindicate Plaintiff's human and civil rights.

**II.      JURISDICTION AND VENUE**

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

20.     This Court has supplemental jurisdiction over the state causes of action pleaded.

21.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying events took place in this district.

III.    **PROCEDURAL REQUIREMENTS**

22.    Prior to the filing of this action, a Charge of Discrimination was filed with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII on May 13, 2020.

23.    The EEOC issued Plaintiff a Right to Sue Notice via electronic portal on or around February 24, 2021, although Plaintiff never received a hardcopy in the mail.

24.    This lawsuit was commenced within 90 days of Plaintiff receiving the Right to Sue Notice.

IV.    **PARTIES**

25.    Daniels is a 61-year old African-American male and practicing Muslim.

26.    Daniels has been continuously employed by HOFSTRA as a Professor of Anthropology since 2005.

27.    In 2010, Daniels earned tenure and became a full-time Professor of Anthropology with HOFSTRA.

28.    Daniels is a resident of the State and City of New York.

29.    HOFSTRA is a university existing under and by virtue of the laws of the State of New York.

30.    HOFSTRA is a private institution with over 10,000 undergraduate and graduate students.

31.    At all relevant times, Defendant HERMAN BERLINER ("BERLINER") was and is the Provost and Senior Vice President for Academic Affairs at HOFSTRA.

32.    BERLINER is a white male and non-Muslim.

33.    BERLINER is sued in his official capacity and in his personal capacity for monetary damages and injunctive relief.

34.     At all relevant times, Defendant BENJAMIN RIFKIN ("RIFKIN") was Dean of HOFSTRA's College of Liberal Arts and Sciences, and is currently Professor of Russian and Comparative Literature, Languages and Linguistics.

35.     RIFKIN is a white male and non-Muslim.

36.     RIFKIN is sued in his official capacity and in his personal capacity for monetary damages.

37.     At all relevant times, the individual defendants had authority to assign duties and responsibilities to employees; supervised and controlled employee work schedules and conditions of employment and possessed authority to promote, demote, and terminate employees.

38.     At all relevant times, the individual defendants were also responsible for and made personnel decisions affecting faculty members.

39.     At all relevant times, the individual defendants were responsible for ensuring that all HOFSTRA employees, including faculty, are not subjected to discriminatory or retaliatory practices.

40.     The individual defendants took no steps to prevent the discrimination and retaliation towards him.

**V.     FACTS COMMON TO ALL CAUSES OF ACTION**

*Daniels' Skills, Qualification and Background*:

41.     Daniels graduated from the State University of New York at Buffalo with a Bachelor of Arts in 1994.

42.     Daniels earned a Master of Arts in 1995 and a Doctor of Philosophy in cultural anthropology in 2001 from the University of Illinois Urbana-Champaign.

43.     Daniels has achieved a long and distinguished career in postsecondary education,

earning tenure in 2010 as a Professor of Anthropology in HOFSTRA's Department of Anthropology.

44.     Daniels' areas of academic interest are anthropology, religious studies, linguistic anthropology and urban studies, and his specific research areas include urban space and ethnicity, globalization and culture, traditional arts and cultural performances and Islamic law and ethics.

45.     As part of his research, Daniels has traveled to and studied multiple field sites in Malaysia and Indonesia, including projects concentrated on urbanization in South Sumatra, Indonesia and Muslim weddings across the Indonesian archipelago, and connections between cultural performance, Muslim religiosities and social change.

46.     Daniels has 20 years of ethnographic research experience in Malaysia and has thus far published 5 books, 7 academic articles and edited and authored 5 chapters in other anthropological volumes.

47.     As part of his more recent undergraduate course load, Daniels has taught entry-level and advanced classes in anthropology, political science and religion.

48.     Since June 12, 2020, Daniels as served as a member of the Black Faculty Council and held the leadership position of Co-Coordinator.

49.     The Black Faculty Council's mission is to promote diversity, end systemic racism and make HOSFSTRA a more inclusive academic environment.

*HOFSTRA Oversees and Approves Daniels' 2019 Field Study Trip to Malaysia*:

50.     In 2017, Daniels began preparing and writing a grant proposal to take a small group of HOFSTRA students to Malaysia to conduct ethnographic research on the dying art of shadow puppetry.

51.     This project was directly connected to Daniels' decade-long research on cultural

performances, but was a new project on shadow puppetry for student research and development.

52.     As a result of Daniels' efforts, in December 2018, HOFSTRA was awarded a $25,000.00 research grant to cover expenses, meaning that four undergraduate students would get to experience real field research, at no cost to them.

53.     Despite the size of the grant and benefit to students, HOFSTRA offered Daniels little to no help or support.

54.     Instead, to prepare the students, Daniels held weekly meetings to read materials on Malaysian society, research methods and theory, review the dress code, discuss research design and plan an itinerary with flexibility to maximize research opportunities.

55.     Daniels also spent the spring and early summer of 2019 coordinating with local contacts in Malaysia to secure traditional Malaysian homestays, vans and drivers, and organize meetings with local performers and officials.

56.     On June 30, 2019, Daniels and four female students departed for Malaysia, with a plan to spend four weeks in the field.

*The HOFSTRA Students Become Dissatisfied with the Malaysia Trip*:

57.     While in Malaysia, one student became unjustifiably dissatisfied with the trip, and a second student became increasingly vocal and threatening when she learned HOFSTRA was going to investigate issues with the trip.

58.     Ultimately, on or around July 17, 2019, the students took the group van without Daniels' permission, leaving him stranded in a shopping mall over 50 miles from their lodging and away from his medications for chronic illnesses.

59.     Overall, the students, despite understanding the nature of the trip, overreacted to an unfamiliar environment and failed to follow Daniels' reasonable instructions; put him at risk when

they abandoned him without his medications; ended the trip prematurely at considerable cost to the sponsor, HOFSTRA, and Daniels' academic and research efforts.

60.     On July 17, 2019, Daniels had a brief phone conference with RIFKIN, Vice Provost Terri Shapiro and a faculty union representative. Daniels explained that there was no danger during the trip, but noted the students' overreaction and threatening comments towards him.

61.     On July 18, 2019, RIFKIN told Daniels to avoid any contact with the students.

62.     On July 20, 2019, the students returned to the United States on flights ordered by BERLINER in coordination with the students' families.

63.     On July 23, 2019, one week earlier than planned, Daniels returned to the U.S.

*The HOFSTRA Students Issue a Litany of Complaints about the Malaysia Trip*:

64.     That same date, on or around July 23, 2019, the students and their parents met with BERLINER and other HOFSTRA administrators to complain about the trip.

65.     The students made many complaints to BERLINER and the administrators, including: that they were allegedly promised luxury accommodations; provided rustic bathrooms; exposed to insects and the local food; not having enough free time on a field research trip; lack of privacy; lack of wireless internet in remote Malaysian villages; being offended by machismo comments in the local language made by random rural farmers during two isolated moments; that they had to visit "rundown" areas of Kuala Lumpur; and, assisting Daniels with driving.

66.     The students also inaccurately claimed that they were not informed about dressing modestly in accordance with local customs.

67.     On the contrary, Daniels had met with the students, on his own time, during weekly meetings to prepare for the trip, including how to dress in a conservative Muslim country.

68.     Finally, the students complained about opinions they had asked Daniels to express

during informal after dinner conversation and which were consistent with his Muslim faith.

*Daniels is Disciplined with Lost Academic Appointments and Associated Pay*:

69.     Between July 23 and August 26, 2019, HOFSTRA, including BERLINER and RIFKIN, discriminatorily did not bother to hear Daniels' account of events in Malaysia.

70.     Instead, HOFSTRA imposed discipline on Daniels without any investigation, and as a result, he was disciplined with no due process, in violation of HOFSTRA's policies and practices.

71.     First, on or around July 29, 2019, RIFKIN told Daniels he could not serve as Acting Chair of the Department of Anthropology, given the students' allegations.

72.     Prior to these allegations, Daniels was selected to serve as Acting Chair for the Fall 2019 and Spring 2020 semesters, and subsequently the permanent Department Chair.

73.     Both the Acting and permanent Chair positions came with a pay increase.

74.     Second, on or about August 13, 2019, Daniels was informed by the Dean of HOFSTRA's Honors College, Warren Frisina, that BERLINER refused to sign the paperwork for Daniels' reappointment as an Honors College Mentor.

75.     As an Honors College Mentor, Daniels would have been entitled to a payment of over $10,000.00 per semester.

76.     BERLINER's discriminatory refusal to sign the papers was in spite of Daniels having served as an Honors Mentor in the Spring 2019 semester and being promised that he would continue as an Honors College Mentor.

*Daniels Complains to BERLINER and RIFKIN*:

77.     On August 13, 2019, Daniels emailed BERLINER and RIFKIN to formally complain about losing the Acting Chair and Honors College positions.

78.     Daniels' email requested a date when Defendants could hear his account of the Malaysia trip.

79.     BERLINER emailed that August 26, 2019 was the earliest day they could meet.

80.     However, before any investigation or formal disciplinary process was complete and following his August 13, 2019 email, Daniels was told that it would be years before he would be considered for Chair, simply due to the students' allegations.

81.     Specifically, throughout the pendency of the disciplinary process, prior to any decision, HOFSTRA and BERLINER repeatedly represented that Daniels would not be Chair or even considered for Chair for several years – regardless of the outcome of any formal disciplinary process.

*Daniels Complains of Discrimination and Violation of HOFSTRA's Anti-Discrimination Policy:*

82.     On August 15, 2019, Daniels emailed BERLINER, RIFKIN, and other relevant administrators regarding "Violations of Hofstra's Freedom from Discrimination Policy," and copied HOFSTRA's Harassment Advisor and Title IX Officer for Employee Matters.

83.     Daniels' email complained that the students' false accusations against a Black "racialized" professor were used to revoke his appointments as Acting Chair and Honors College Mentor, in violation of HOFSTRA's anti-discrimination policy. Daniels asked the Title IX officer to take action in response to his complaint.

84.     On or around August 16, 2019, Daniels learned that BERLINER – without hearing Daniels' account – was leaning toward pursuing formal discipline against him by referring the case to the Faculty Senate Grievance Committee ("Grievance Committee").

85.     On August 26, 2019, Daniels met with BERLINER, RIFKIN, Special Advisor to the Provost Margaret Abraham and others, where he presented his account of the Malaysia trip.

86.     However, ignoring evidence that Daniels did nothing wrong, BERLINER stated that HOFSTRA would prepare charges against him that would be placed before the Grievance Committee.

87.     Tellingly, BERLINER did not disclose what HOFSTRA rule Daniels was accused of violating.

*BERLINER Files Disciplinary Charges against Daniels & an Irregular Procedure is Used to Prosecute and Convict Daniels:*

88.     In September 2019, BERLINER, as the complainant, filed disciplinary charges against Daniels on behalf of the students and asked the Grievance Committee to hold hearings pursuant to HOFSTRA's collective bargaining agreement ("CBA").

89.     The Grievance Committee contained no minority professors and had few, if any, professors with field research experience.

90.     Moreover, the Grievance Committee, working closely with HOFSTRA's General Counsel, who is extremely loyal to BERLINER, as permitted under the CBA, denied Daniels due process by regularly violating the CBA's requirements for hearings and created procedural irregularities by, for example:

a.     denying Daniels' right to fully or fairly cross-examine the complaining students;

b.     denying Daniels' right to hear live testimony from all students;

c.     denying Daniels' right to present rebuttal witnesses during live hearing testimony;

d.     denying Daniels' right to obtain discovery from the complaining students;

e.     refusing to identify the actual rule or policy Daniels allegedly violated with any reasonable particularity and refusing to withdraw the charges as a result;

and,

f.    refusing to identify the burden of proof that would be applied until the
hearing process was almost over.

91.    On April 30, 2020, BERLINER emailed Daniels that he received the Grievance
Committee's March 16, 2020 Report and "fully accepted the conclusions and recommendations of
the Committee."

92.    BERLINER placed the Committee's Report in Daniels' personnel file and
threatened that he was prepared to take further disciplinary action unless Daniels provides "an
appropriate apology in writing to the students involved in the Malaysia experience as the
Committee recommended."

93.    In a statement under duress, and noting his belief that the charges and procedure
were discriminatory and retaliatory, Daniels was forced to submit a written apology for fear that
his family, who had suffered financially already, would risk an uncertain and arbitrary punishment
by BERLINER.

94.    In Spring 2020, in order to block Daniels and manufacture a pretextual reason for
why he could not be Chair, Defendants had the incumbent Chair stay on in the position.

95.    Typically, an incumbent Chair would not be asked to continue indefinitely, as was
done here to block Daniels.

_Defendants Deny Daniels the Chair Appointment in 2021_:

96.    On February 24, 2021, Daniels notified HOFSTRA that he wanted to be considered
for the open Chair of Anthropology position beginning in Fall 2021 and formally applied.

97.    In April 2021, HOFSTRA, at the direction of BERLINER, informed Daniels that
he was not selected for Chair and the position would go to the current Chair of the Sociology

Department, which would merge with Anthropology.

98.     The position, which included a monetary component, went to a non-minority and non-Muslim who had not engaged in protected activity.

99.     True to BERLINER's threat, Daniels was passed over for the Chair position by Defendants due to his prior complaints of discrimination and as part of the discrimination and selective enforcement resulting from the Malaysia trip.

100.    In February 2021, HOFSTRA informed Daniels that it could not find a classroom for his course in the Fall and pressured Daniels to change the course time.

*BERLINER Blocks Daniels from Serving on the Provost Search Committee in 2021*:

101.    Since BERLINER plans to retire as Provost in August 2021, a Provost Search Committee was commissioned to locate his replacement.

102.    In 2021, the Hofstra College of Liberal Arts and Sciences ("HCLA") Executive Committee requested that a seat on the Provost Search Committee be designated for a member of the Black Faculty Council.

103.    On or about May 21, 2021, Daniels learned that BERLINER had denied the request.

104.    For discriminatory and retaliatory reasons, BERLINER did not want Daniels to influence who would succeed him as Provost and did not want Daniels to elevate his career trajectory and leadership development by serving on a visible and influential search committee.

*Based on HOFSTRA's History of Ignoring Complaints about White Faculty, Daniels is Treated Worse than Non-Minority HOFSTRA Faculty*:

105.    While many in the United States are coming to terms with the painful history of racial discrimination and injustice due to recent events and social movements, HOFSTRA has remained tone-deaf and unresponsive to discrimination complaints within its community.

106.    As one of the few Black or Muslim professors at HOFSTRA, Daniels was treated

less favorably than faculty outside of those protected minority categories.

107.    In or around 1998, under BERLINER's leadership as Provost, a student on a school trip abroad wrote a letter of complaint about the trip, but HOFSTRA took no action and summarily dismissed the complaint, which involved a White female faculty member, with no formal disciplinary actions or any pre-investigative removal from faculty posts.

108.    At various times, many problems have occurred on HOFSTRA's European Odyssey trips, led by non-Black and non-Muslim Professors. During a trip in Greece, the group's car was broken into and all the student's passports were stolen. During the same or similar trip, students were involved in a riot and one student had his jaw broken.

109.    Upon information and belief, the non-Black, female and non-Muslim faculty were not subjected to pre-investigative punishment, denial of faculty posts or subjected to a formal disciplinary process.

110.    Moreover, HOFSTRA has a history of brushing aside Black students' complaints about White faculty.

111.    In or around 1999, Black students complained about a White philosophy professor who they believed had purposely lowered their grades and stated that the students must be doing poorly in other classes. The students' report was ignored.

112.    To Defendants' knowledge, other HOFSTRA students have made various complaints against non-minority faculty and administrators, and little to nothing has been done.

113.    In some cases, minority students or faculty that complained about non-minority faculty have been pressed to drop their complaints or ignored without HOFSTRA taking disciplinary action or removing academic appointments simply because a student complained.

114.    Often, students of color have reported to Daniels that they often do not even get a

response from the department chair or dean when they complain, and if they do, little to nothing is done.

115.    For example, a White professor has made disparaging remarks to minority professors and claimed, for example, that Asians are the only minority group that values hard work and education. While the White faculty member has been reported multiple times to HOFSTRA, RIFKIN and BERLINER, no investigations or actions have been taken, in stark contrast to the rush of judgment against and harsh treatment of Daniels.

116.    Instead, as a pretext to protect White faculty, HOFSTRA claims they cannot do anything because of tenure while Daniels, a tenured faculty, has been unjustifiably punished and ominously threatened by BERLINER with more severe discipline and treated as a common criminal when students complained.

117.    In or around the Fall of 2018, a student complained in class about the number of times a non-black history professor used the most offensive racial slur in class. In response, the professor assigned a reading by a Puerto Rican author arguing that non-Black persons can say "nigger" to harass the student. Upon information and belief, the professor received no formal disciplinary charges or investigation, and the professor did not have any faculty posts removed or withheld by Defendants.

118.    In the Spring of 2019, Black students complained that a White professor at HOFSTRA was not including students of color in his class and, upon information and belief, no investigation or corrective action were taken by Defendants.

119.    In the Spring of 2019, a student complained that a non-Muslim male professor was stalking the student outside of class and insisting on meeting privately during office hours. Despite the complaints, upon information and belief, Defendants took no investigative or corrective action

against the professor.

120.    In or around March 2019, a White professor gave a lecture that included disturbing images of women being sexually assaulted and abused that served no educational value and was simply designed to shock. Students, who were not warned about the content, walked out of the lecture and missed the next class.

121.    BERLINER was involved with responding to student complaints where, upon information and belief, no disciplinary actions or even counseling for the White professor occurred.

122.    In or around April 2019, a Black student was discussing views about white veganism stemming from racism with a friend, when a White Dean at HOFSTRA misunderstood the conversation and began yelling at and berating the Black student.

123.    When the Black student complained to BERLINER, no action was taken, and upon information and belief, the White Dean was not counseled or disciplined.

124.    On other recent occasions, students have complained about a White Dean using a stereotypical urban "Black voice" during her lectures and, upon information and belief, no meaningful investigation or discipline occurred and the Dean did not face any losses of faculty posts.

125.    Recently at HOFSTRA, students and faculty of color have been asking for things like mandatory bias training and are told constantly that those cannot be mandated because of union rules.

126.    For example, in October 2020, HOFSTRA hired a white performer as a "clown" who wore a face mask that resembled blackface and minstrel characters and was hurtful and offensive to the University's Black community.

127.    In response, BERLINER issued a half-hearted statement containing equivocation and questioning whether the blackface was intentional and failing to call the act racist.

128.    Due to pressure, particularly from Black students and faculty, HOFSTRA was forced to issue a much stronger statement condemning the incident, taking responsibility and apologizing, effectively pushing aside BERLINER's tepid response.

129.    Based on the above, the actions taken against Daniels are disproportionate with the claims and are discriminatory and disparate with the treatment of similarly situated White, non-Muslim and female faculty members.

130.    Moreover, the disciplinary charge against Daniels initially did not state what rules or regulations he violated.

131.    HOFSTRA only identified a claimed violation of an actual rule when pressed to drop the charges after it already initiated the disciplinary process.

*BERLINER Rejects Recommendations to Make HOFSTRA a More Inclusive Community for Black Faculty and Students:*

132.    BERLINER has been hostile for the last year in which Daniels and the Black Faculty Council tried to work with him to change some institutionalized racist conditions on campus.

133.    In or around December 2020, the Black Faculty Council held a meeting with BERLINER and other administrators to address systemic racism.

134.    The Council submitted a list of seven recommendation to BERLINER designed to improve Black faculty hiring and retention, increase Black faculty inclusion on key committees, improve public safety officer hiring and behavior on campus, among others.

135.    BERLINER rejected all the recommendations with no justification.

136.    As a proximate result of Defendants' discriminatory conduct towards Daniels, he

has suffered and continues to suffer significant monetary loss and damages, including the loss of past and future earnings, and other employment benefits.

137.    As a further proximate result of Defendants' actions, Daniels experienced elevated stress levels, severe emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

138.    Defendants' conduct was outrageous and malicious, intended to injure Daniels, and carried out with reckless indifference to his protected civil rights, thereby entitling him to punitive damages.

139.    Daniels has no complete, plain, clear or adequate remedy at law.

140.    Defendants' acts against Daniels continue. Defendants must be restrained from further discrimination against Daniels and directed to cease and desist from their unlawful acts against him.

141.    Daniels believes Defendants' unlawful acts against him will continue until this Court, by injunction and/or its judgment, compels otherwise.

## FIRST COUNT AGAINST HOFSTRA
### (Discrimination in Violation of Title VII)

142.    Daniels repeats and realleges each allegation in each numbered paragraph above.

143.    Defendants subjected Daniels to differential terms and conditions of employment because of his race, color, sex and religion, including, but are not limited to:

      a.    revoking Daniels' appointment to be Acting Chair of the Department of Anthropology;

      b.    refusing to consider Daniels for appointment to permanent Chair of the Department of Anthropology indefinitely;

      c.    refusing to allow Daniels to be reappointed as an Honors College Mentor;

d.   filing disciplinary charges against Daniels;

e.   directing the Grievance Committee to hold hearings pursuant to HOFSTRA's CBA; and,

f.   blocking Daniels from serving on the Provost Search Committee.

144.   All the foregoing actions were taken by HOFSTRA in order to deprive Daniels of employment and other contractual opportunities on account of his race, color, sex and religion.

145.   Because of the willful and deliberate actions of Defendants, and as a proximate cause, Daniels has been denied his right to equal employment opportunity in violation of Title VII.

146.   By reason of the above, Daniels suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SECOND COUNT AGAINST HOFSTRA
### (Retaliation under Title VII)

147.   Daniels repeats and realleges each allegation in each numbered paragraph above.

148.   Defendant HOFSTRA's conduct was retaliation for Daniels' complaints of discrimination on the basis of race, color, sex and religion, and violated his rights under Title VII.

149.   By reason of the above, Daniels suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## THIRD COUNT AGAINST BERLINER and RIFKIN
### (Race Discrimination under Section 1981)

150.   Daniels repeats and realleges each allegation in each numbered paragraph above.

151.   Defendants subjected Daniels to differential terms and conditions of employment because of his race.

152.   Specifically, Daniels was, *inter alia*, denied Acting Chair of the Department of Anthropology and Honors College Mentor positions and subjected to false disciplinary charges.

153.    Defendants took the foregoing actions to deprive Daniels of equal employment opportunities and other contractual opportunities on account of his race.

154.    Because of Defendants' willful and deliberate actions, and as a proximate cause thereof, Daniels has been denied his right to equal employment opportunity in violation of Section 1981.

155.    By reason of the above, Daniels suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## FOURTH COUNT AGAINST BERLINER and RIFKIN
### (Retaliation under Section 1981)

156.    Daniels repeats and realleges each allegation in each numbered paragraph above.

157.    Defendants' conduct was retaliation for Daniels' complaints of discrimination on the basis of race and color, and violated Plaintiff's rights under Section 1981.

158.    By reason of the above, Daniels suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## FIFTH COUNT AGAINST ALL DEFENDANTS
### (Race, Color, Sex and Religion Discrimination in Violation of the NYSHRL)

159.    Daniels repeats and realleges each allegation in each numbered paragraph above.

160.    At all relevant times, Daniels was an "employee" within the meaning of the NYSHRL.

161.    By adversely affecting the terms, conditions and privileges of Daniels' employment because of his race, color, sex and religion, Defendants violated the NYSHRL.

162.    By reason of the above, Daniels suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**SIXTH COUNT AGAINST ALL DEFENDANTS**
**(Retaliation in Violation of NYSHRL)**

163.    Daniels repeats and realleges each allegation in each numbered paragraph above.

164.    All the various actions Defendants took against Daniels subsequent to when he complained of discrimination constitute unlawful retaliation in violation of the NYSHRL.

165.    By reason of the above, Daniels suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**VICARIOUS LIABILITY**

166.    At all relevant times, HOFSTRA is vicariously liable for the actions of the individual Defendants.

**PUNITIVE DAMAGES**

167.    Daniels claims punitive damages by reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendants herein-above alleged.

**WHEREFORE,** Daniels prays that this Court grant him judgment containing the following relief:

a.    Impanel a jury to hear Daniels' claims;

b.    An award of damages in an amount to be determined at the trial to compensate Daniels for his monetary loss and damages, including Daniels' loss of past and future earnings, bonuses, compensation, and other employment benefits;

c.    An award of damages to compensate Daniels for mental anguish, humiliation, embarrassment, and emotional injury for each cause of action;

d.    An award of damages in an amount to be determined upon the trial of this matter to compensate Daniels for violating his rights under Title VII, Section 1981, the NYSHRL;

- 21 -

e.  An award of punitive damages to be determined at the time of trial for the claims

under Title VII, Section 1981, the NYSHRL;

f.  An award of reasonable attorneys' fees and costs related to Daniels' claims under

Title VII, Section 1981, the NYSHRL; and,

g.  Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       May 24, 2021

Respectfully Submitted,

_____
SAMUEL O.  MADUEGBUNA, ESQ.
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiff,
TIMOTHY DANIELS
30 Wall Street, 8th Floor
New York, New York 10005
(212) 232-0155

TO:  HOFSTRA UNIVERSITY
     1000 Hempstead Turnpike
     Hempstead, New York 11549

     HERMAN BERLINER
     c/o HOFSTRA UNIVERSITY
     1000 Hempstead Turnpike
     Hempstead, New York 11549

     BENJAMIN RIFKIN
     c/o HOFSTRA UNIVERSITY
     1000 Hempstead Turnpike
     Hempstead, New York 11549