UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TIMOTHY DANIELS,

        *Plaintiff,*

    -against-

HOFSTRA UNIVERSITY, HERMAN BERLINER,
BENJAMIN RIFKIN, and JOHN and JANE DOES 1 –
5,

        *Defendants.*

21-CV-2920 (ARR) (LGD)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

**OPINION & ORDER**

ROSS, United States District Judge:

    Plaintiff, Timothy Daniels, brings this action against his employer, Hofstra University ("Hofstra"), and various individuals employed by Hofstra (collectively "Defendants"). Plaintiff alleges that, in the wake of an ill-fated student research trip that he led, Defendants rushed to judgment and subjected him to differential treatment based on his race, color, and/or religion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and the New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* ("NYSHRL"). Plaintiff also alleges that he faced unlawful retaliation for complaining about discrimination, and for preparing to file this lawsuit. Before me is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Defs.' Mem. L. Supp. Mot. Summ. J. ("MSJ"), ECF No. 95-1; *see also* Pl.'s Mem. L. Opp'n Mot. Summ. J ("Pl.'s Opp'n"), ECF No. 96; Def.'s Reply Supp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 98.) For the reasons that follow, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts are taken from defendant's Rule 56.1 Statement, plaintiff's Rule 56.1 counterstatement, and the evidentiary materials cited therein.  (*See* Defs.' Revised Local Rule 56.1 Statement Material Facts Supp. of Mot. Summ. J., ECF No. 95-4 ("DSOF"); Pl.'s Revised Local Rule 56.1 Statement Material Facts, ECF No. 96-1 ("PSOF").)  Unless otherwise noted, each fact is either undisputed or the opposing party has not pointed to any evidence to contradict it.

### *The Parties*

Plaintiff is a tenured Professor in the Department of Anthropology at Hofstra who identifies as male, African American, and Muslim.  (DSOF ¶ 1; PSOF ¶¶ 105, 107.)  Plaintiff joined the Hofstra faculty in 2005, was reappointed twice before he was promoted to the rank of Assistant Professor, and was awarded tenure in 2011.  (DSOF ¶¶ 2–4.)  At the time plaintiff was awarded tenure, less than 4% of Hofstra's faculty identified as Black and more than 80% identified as white.  (PSOF ¶ 106.)  In or around June 2020, plaintiff and others formed the Black Faculty Council ("BFC") with the stated goal of addressing "systemic racism and anti-Black bias at Hofstra."  (DSOF ¶ 75; PSOF ¶ 148; *see* Rosenberg Decl. Ex. 14, ECF 95-19.)

The following individuals held relevant decision-making roles at Hofstra during the relevant period, between 2019 and 2022.  At the start of the relevant period, defendant Benjamin Rifkin was the Dean of Hofstra's College of Liberal Arts and Sciences ("CLAS"), defendant Herman Berliner was the Provost and Senior Vice President for Academic Affairs, and Sharryn Kasmir was the Chair of the Anthropology Department.  (DSOF ¶¶ 13, 23, 34; *see* Compl. ¶¶ 31, 34 ECF No. 1.)  Rifkin stepped down from his role as CLAS Dean on January 1, 2021, and was replaced on an interim basis by Daniel Seabold as

2

Acting Dean.  (DSOF ¶ 57.)  Berliner stepped down from his role as Provost on or about July 31, 2021 and was replaced on an interim basis by Janet Lenaghan. (*Id*. ¶¶ 58, 76.) Charles Riordan was ultimately appointed Provost.  (*Id*. ¶ 69.)  Kasmir's three-year term as Chair of the Anthropology Department ended in Summer 2021. (*Id*. ¶ 59.)  The Department was temporarily led by an external chair for one academic year, after which plaintiff was appointed Chair of the Anthropology Department.  (*Id*. ¶¶ 59, 67–70.)

### *The Malaysia Trip & Grievance Process*

In 2019, plaintiff received grant funding to take several Hofstra students on a field research trip to Malaysia to conduct ethnographic field research on the art of shadow puppetry.  (PSOF ¶¶ 112–13.)  While Hofstra administrators were aware of the trip, plaintiff took responsibility for planning the trip and selecting the students who would accompany him.  (*Id*. ¶¶ 116; DSOF ¶ 9.)  Plaintiff ultimately selected four female students (the "Students") to go on the trip.  (DSOF ¶ 11.)  Prior to departing, plaintiff communicated over email with the Students about the proposed itinerary, transportation, and accommodations.  (PSOF ¶ 121.)  The group departed on June 30, 2019 with the plan to spend four weeks conducting research in Malaysia.  (*Id*. ¶ 125.)  Once in Malaysia, at least two of the Students expressed concern to plaintiff about various aspects of the trip, including the security of their lodging, their interactions with men in rural villages, and the safety of their transportation in a rented van that was at times driven by a Student. (DSOF ¶¶ 12, 22; PSOF ¶ 127.)  On July 15, 2019, the mother of one Student contacted Rifkin and requested that the students return home due to safety concerns.  (DSOF ¶ 13.) On July 17, 2019, the Students parted ways with plaintiff and requested that Hofstra administrators make arrangements for them to return home early.  (*Id*. ¶¶ 16, 19.)  One of the Students emailed Rifkin indicating that the Students did not intend to respond to

further communication from plaintiff because they were "not . . . comfortable being in contact with him." (*Id.* ¶ 19.)  Hofstra administrators, including Rifkin, spoke separately with plaintiff by phone and subsequently instructed plaintiff over email on July 18, 2019 to cease interactions with the Students.  (*Id.* ¶¶ 15, 20.)

The Students returned to the United States on July 22, 2019.  (*Id.* ¶ 21.)  The next day, the Students met with Hofstra administrators to relay their experiences and discuss their concerns about the Malaysia trip.  (*Id.* ¶ 22.)  Plaintiff returned to the United States on July 23, 2019, but did not meet with Hofstra administrators, including Rifkin, until August 26, 2019.  (*Id.* ¶¶ 17–18.)  Plaintiff repeatedly expressed a desire to meet with administrators sooner but was told that doing so was impossible due to planned vacations.  (PSOF ¶ 17; *see* Maduegbuna Decl. Ex. A, ECF No. 96-6.)  During the intervening period, plaintiff was informed that, while the Malaysia Trip was under review, he would not be permitted to carry out his appointments as Mentor in the Honors College or as Acting Chair of the Department of Anthropology during a one-week vacation of then-Chair Sharryn Kasmir, from August 26 to September 1, 2019. (DSOF ¶¶ 23, 26–27; *see* Rifkin Decl. Ex. 9, ECF No. 95-66; Berliner Decl. Ex. 12, ECF No. 95-38.)  Plaintiff had previously served as an Honors College Mentor and had been slated to serve as Acting Chair during Kasmir's vacation.  (DSOF ¶¶ 23; 71–73.)  On August 15, 2019, after plaintiff learned that both appointments had been terminated, he submitted a "brief memo" to Hofstra administrators, including Berliner and Rifkin, in which he stated that he was making a "formal complaint" about the conduct of the Students and invoked Hofstra's "Freedom from Discrimination Policy."  (PSOF ¶ 29; *see* Berliner Decl. Ex. 13, ECF No. 95-39.)

On August 26, 2019, plaintiff met with multiple Hofstra administrators, including

Berliner and Rifkin, and a faculty union representative, to discuss the Malaysia Trip. (DSOF ¶ 30.)  During that meeting, plaintiff disagreed with the Students' account of the Trip in many respects.  (*Id.* ¶ 31.)  After the meeting, Berliner referred the matter to the Hofstra University Faculty Grievance Committee ("Grievance Committee") by filing a "statement of charges" outlining potential grounds for discipline. (*See* PSOF ¶¶ 32, 37; Rosenberg Decl. Ex. 9 (statement of charges), ECF No. 95-14).  The Grievance Committee process was governed by the Collective Bargaining Agreement ("CBA") between Hofstra and the faculty union and the Bylaws of the Hofstra University Senate.  (DSOF ¶¶ 35–36; *see* Berliner Decl. Ex. 14., ECF No. 95-40 (CBA); Berliner Decl. Ex. 15, 95-41 (bylaws).) In his statement of charges, Berliner specifically charged plaintiff with violating Hofstra's Faculty Policy Series #99—which is titled "A Code of Professional Responsibility for Faculty"—by "placing the students in harms' way and at risk" during the Malaysia Trip. (DSOF ¶¶ 37–38; *see* Berliner Decl. Ex. 16 (Faculty Policy Series #99), ECF No. 95-42.)

The Grievance Committee convened several times for preliminary matters and held hearings on January 13, 2020 and February 18, 2020.  (DSOF ¶ 42.)  During the hearings, the Grievance Committee reviewed documentation and heard testimony from two of the Students, Berliner, and plaintiff.  (*Id.* ¶¶ 43–45.)  Plaintiff was present with counsel for the entirety of the hearings.  (*Id.* ¶ 43.)  On March 16, 2020, the Grievance Committee issued its "Report of Findings & Recommendation" (the "Report").  (*Id.* ¶ 48; Rosenberg Decl. Ex. 10, ECF No. 95-15 (copy of the Report).)  The Report set forth the following conclusions:

> Based on all evidence before the Grievance Committee, we find that the Provost has met his burden of proof by a preponderance of the evidence that Professor Daniels engaged in unprofessional conduct by displaying poor judgment in connection with the planning and oversight of the Malaysia trip, although we also find that there were some events which occurred that

were out of his control.

(DSOF ¶ 48.)  The Report recommended, *inter alia*, that plaintiff apologize to the Students and that Hofstra issue a written warning to plaintiff.  (*Id*. ¶ 49.)  After receiving the Report, Berliner sent an email on April 30, 2020 informing plaintiff that a copy would be placed in his personnel file, and stating that Berliner was "prepared to take no further action if there [was] an appropriate apology in writing to the students[.]"  (PSOF ¶¶ 50–51; *see* Rosenberg Decl. Ex. 11., ECF No. 95-16.)  On June 5, 2020, plaintiff sent Berliner a memo stating that he had written an apology to the Students "under duress" and was "presenting it as a result of [] coercion[.]"  (PSOF ¶ 51; *see* Rosenberg Decl. Ex. 12, ECF No. 95-17.)

### *Post-Grievance Committee Events*

Around the time the Grievance Committee process finished, plaintiff and other faculty members formed the Hofstra University Black Faculty Council ("BFC") with the goal of addressing "systemic racism and anti-Black bias" at Hofstra.  (DSOF ¶ 75; PSOF ¶ 148; *see* Rosenberg Decl. Ex. 14, ECF No. 95-19.)  On June 26, 2020, the BFC sent a list of recommendations to Hofstra administrators, including the recommendation that members of the BFC participate in "search committees" for "upper level" administrative posts.  (*Id*.)  Hofstra administrators, including Berliner, met with members of the BFC to discuss their recommendations two times during 2020.  (DSOF ¶ 75.)  The administrators agreed to some of the requests and rejected others.  (*See* PSOF ¶¶ 75; 148–49.)

On April 27, 2021, Berliner circulated an email announcing the creation of a search committee (the "Search Committee") tasked with selecting Hofstra's next provost.  (DSOF ¶ 76.)  Berliner's announcement instructed that the Executive Committees for each school would be responsible for selecting a representative.  (*Id*.)  Nine individuals, including

6

plaintiff, were nominated to serve on the Search Committee on behalf of the CLAS.  (*Id.* ¶ 77.)  Email evidence adduced in discovery shows that Hofstra President, Susan Poser, sought input from Vice Provost Margaret Abraham regarding plaintiff's fitness to serve on the Search Committee in or around May 2021. (*See* PSOF ¶¶ 77, 160.)  In deposition testimony, Abraham stated that, when consulted by Poser about plaintiff, she mentioned the Students' complaints about the Malaysia Trip and this lawsuit, which was filed around the same time.  (*See* Maduegbuna Ex. R, ECF No. 96-20; Compl. (filed May 24, 2021).)  Plaintiff was ultimately not appointed to the Search Committee, though at least two other faculty members of color were.  (*See* PSOF ¶¶ 81, 160.)  Berliner stepped down as Provost on July 31, 2021 and was replaced by Janet Lenaghan as Interim Provost.  (DSOF ¶ 58.)

Also during spring of 2021, Hofstra administrators were considering who would become the new Chair of Anthropology when Kasmir's three-year term came to an end that summer.  (*Id.* ¶ 59; *see* Compl. ¶ 97.)  Before Kasmir's term officially ended, plaintiff served as Acting Chair from August 2 to August 27, 2021.  (DSOF ¶ 56.)  The Anthropology Department had only three full-time faculty members and was the smallest Department at Hofstra.  (*Id.* ¶ 59.)  As the end of Kasmir's term approached, Hofstra administrators began discussing the possibility of merging Anthropology with another department, such as Sociology.  (*Id.* ¶ 60.)   The rationale for considering such a merger is contested.  (*See* PSOF ¶¶ 61–66).  Despite opposition from the Anthropology faculty, Acting Dean Seabold appointed an "external chair" from the Sociology Department for the 2021–22 school year.  (*Id.* ¶ 67.)  Ultimately, Hofstra administrators decided not to merge Anthropology with another department because the Sociology Department objected.  (*Id.* ¶ 68.)  Plaintiff was appointed Chair of the Anthropology Department in September 2022.  (*Id.* ¶ 69.)  Plaintiff was reappointed Chair for another one-year term for the 2023–24 school year

and, as of the date the instant motion was filed, remained in the position. (DSOF ¶ 70; MSJ at 5.)

### *Other Instances of Alleged Faculty*

Plaintiff's discrimination claims turn on the assertion that Hofstra responded differently to alleged instances of misconduct by white faculty. (*See* Compl. ¶¶ 106–17.) The parties Rule 56.1 Statements address twenty-one potential faculty comparators, each of whom is identified by the pseudonym "Prof." followed by a number (e.g. "Prof. 1"). (DSOF ¶¶ 82–101; PSOF ¶¶ 82–101, 163–172.) In recounting the relevant facts, I have grouped the potential comparators based on the nature of their alleged misconduct and the University's response.

Two of the potential comparators are faculty who encountered challenges while supervising students during study abroad trips. The first is a white female professor (Prof. 13) who accompanied students on numerous trips through a Hofstra study abroad program that she directed for many years. (PSOF ¶¶ 82, 33; *see* Rosenberg Decl. Ex. 19, ECF 95-24.) During one such trip, several students were involved in a physical altercation that left at least one with an injury. (*Id.*) There is no evidence that Hofstra received any student or parent complaints about Prof. 13. (DSOF ¶ 82.) The second is a white female professor (Prof. 15) who also led study abroad trips for many years. (PSOF ¶¶ 33, 83; *see* Rosenberg Decl. Ex. 20, ECF 95-25.) During one such trip, Prof. 15 had to send a student home due to excessive drinking and other inappropriate behavior. (*Id.*) The student's parent initially complained that her son was sent home but, after learning more, agreed with Prof. 15's decision. (*Id.*) There is no evidence that Hofstra received any other student or parent complaints about Prof. 15 regarding student safety. (DSOF ¶ 83.) Neither Prof. 13 nor Prof. 15 were formally investigated or referred for discipline in

connection with their roles as trip leaders.

Three potential comparators were accused of inappropriate conduct of a sexual or romantic nature.  The first, Prof. 3, is a white male professor who sent a love letter to a student.  (DSOF ¶ 95; PSOF ¶ 163.)  When the letter came to the attention of the Provost's Office, and after pressure from students, Berliner met with Prof. 3.  (*Id.*)  Prof. 3 agreed that he would not be promoted to chair of his department while the student was still enrolled, but did not face formal charges or discipline.  (*Id.*)  The second is Prof. 7, a white male professor who allegedly touched students inappropriately during one-on-one interactions.  (DSOF ¶ 96.)  After the allegations were reported, they were referred to the Title IX office and Prof. 7 was placed on leave.  (*Id.*; *see* Rosenberg Decl. Ex. 6, ECF No. 95-11.)  Prof. 7 left Hofstra before the Title IX investigation was complete.  (*Id.*)  The third is Prof. 12, a white male professor who made inappropriate comments regarding a student's appearance and allegedly referred to a student by his race, rather than his name.  (DSOF ¶ 95; PSOF ¶ 164.)  Prof. 12 received a verbal reprimand but no formal discipline.  (*Id.*)

Three other potential comparators allegedly acted in a manner that compromised student safety.  Prof. 5, a white male, was accused of yelling at a Black student in an intimidating manner during a private meeting after that student published an op-ed about the culture of the Honors College in the Hofstra newspaper.  (DSOF ¶ 97; PSOF ¶ 166; *see* Maduegbuna Decl. Ex. WW.)  Prof. 5 published a response to the op-ed and did not face any formal consequences.  (PSOF ¶ 97.)  The substance of the disagreement between the student and Prof. 5 is unclear from the materials before me.  Prof. 16, a white female, failed to follow lab safety protocols for mixing chemicals (DSOF ¶ 97; PSOF ¶ 167.)  There were serious discussions about denying Prof. 16 tenure as a result of the incident, but the

faculty union ultimately negotiated a resolution by which Prof. 16 took responsibility for the incident and agreed to abide by safety protocols going forward. (*Id.*) Prof. 31 was allegedly present on a hunting trip during which someone was shot. (*See* PSOF ¶ 33.) There is no evidence in the record regarding Prof. 31's role in the incident, Defendants' awareness of the incident, or Defendants' response.

Nine of the potential comparators are faculty whose conduct was reported by students as racist, inappropriate, or insensitive. Prof. 1, a white male, was reported for talking inappropriately about his personal life during class, including the death of his son by suicide. (DSOF ¶ 97.) Prof. 1 did not face any discipline. (*Id.*) Prof. 9, a white male, was accused in a student's social media post of using a racial slur. (DSOF ¶ 98.) The student did not report the incident, but Defendants became aware of it when another student emailed Prof. 9 about the student's post. (*See* Rifkin Decl., Ex. 11., ECF No. 95-68.) Prof. 9 filed a complaint against the student, who was ultimately cleared of violations of the student code of conduct. (*See* Maduegbuna Decl., Ex. QQQ (decl. of student).) Prof. 10, a white male, was reported by students for showing disturbing historical images of sexual abuse from the Soviet Union in class. (DSOF ¶ 97; *see* Rosenberg Decl. Ex. 4, ECF No. 95-9.) Prof. 10 did not face any discipline, but did implement new procedures for alerting students before showing disturbing images. (*Id.*) Prof. 11, a white woman and Honors College dean, was accused of using a racist caricature voice while reading works by Black authors. (DSOF ¶ 97.) After the Provost's Office received student complaints, a dean spoke with Prof. 11 and no further complaints were filed. (PSOF ¶ 97.) Prof. 14, a black male, was reported for breaching the confidential process for submitting student evaluations and, separately, for misgendering certain students. (*Id.*) As a result, Prof. 14's tenure probationary period was extended by one year. (*Id.*) Prof. 20, a white Jewish

male, was reported to telling a student that she should not observe a Jewish holiday. (DSOF ¶ 97.)  The student transferred to another class and Prof. 20 did not face formal discipline (PSOF ¶ 97.)  Finally, according to plaintiff, Profs. 6, 8, and 17 were accused of racist conduct (i.e. using racial slurs and singling out a Black student to opine on racial stereotypes in class), but there is no evidence that the incidents were ever reported to any of the named Defendants.  (PSOF ¶¶ 99–101.)

Finally, there four potential comparators were disciplined for conduct that did not involve interactions with students.  Prof. 2, a white female, was accused of seriously bullying another faculty member.  (DSOF ¶ 85.)  Berliner referred the faculty member's complaint to the Greivance Committee and the faculty union negotiated a resolution. (*Id.* ¶¶ 86–87.)  Prof. 4, a white female, was accused of plagiarizing a student's work. (*Id.* ¶ 88.)  Prof. 4 was referred by Berliner to the Grievance Committee, which concluded that there was not "clear and convincing evidence" that plagiarism had occurred.  (*Id.* ¶ 90; *see* Berliner Decl. Ex. 24, ECF 95-50.)  Prof. 18, a white male, was accused of inappropriate and hostile behavior toward a Black female faculty member.  (DSOF ¶ 91.) Berliner submitted written charges to the Grievance Committee, which resolved that Prof. 18 could not stand tenure for an additional two years.  (*Id.* ¶¶ 93–94.)  Prof. 19, a white female, was accused of violating copyright law and the Actors' Equity guild while staging a musical.  (PSOF ¶ 95.)  After a meeting with Rifkin to discuss the incident, Prof. 19 was prohibited from directing a production at Hofstra for several semesters.  (*Id.*)

### *Procedural History*

Plaintiff commenced the instant action on May 24, 2021 and the case was initially assigned to the Honorable Gary R. Brown.  (*See* Compl.; Dkt. Entry 5/26/21.)  The case was reassigned to the Honorable Hector Gonzales on June 21, 2022, and again

reassigned to the Honorable Nusrat Choudhury on October 13, 2023. (Dkt. Entries 6/21/22 & 10/13/23.) Defendants requested a pre-motion conference regarding an anticipated motion for summary judgment on January 9, 2024. (ECF No. 72.) Judge Choudhury concluded that a pre-motion conference was not necessary and set a briefing schedule. (Elec. Order 3/14/24; Elec. Order 5/28/24.) Defendants filed the fully briefed motion, which includes more than 1,300 pages of documents, on September 13, 2024. (ECF Nos. 95, 96, 97, 98.) Several days later, Magistrate Judge Dunst ordered the parties to file sworn declarations addressing "whether the parties have a good faith basis to belief that their submissions in connection with the summary judgment motion comply with Local Civil Rule 7.1(a)(3)." (Elec. Order 9/16/24.) Both parties filed such declarations and explained that discovery was extensive because, *inter alia*, there were so many potential comparator faculty members. (ECF Nos. 104 & 105.) On September 17, 2024, plaintiff filed a letter motion seeking to file a 10-page sur-reply and several new declarations in response to Defendants' Reply. (ECF No. 100.) Judge Choudhury denied plaintiff's motion as moot based on her conclusion that the proposed filing would not comply with Local Civil Rule 7.1(a)(3). (*See* Elec. Order 9/18/24; Elec. Order 3/31/25.) On August 25, 2025, the case was reassigned to me. (Elec. Order 8/25/25.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addressing the merits of a summary judgment motion, the court's role is not to resolve issues of fact, but to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995). To prevail on a motion for

summary judgment, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). To defeat a motion for summary judgment, the nonmoving party may not rely on unsupported assertions or "metaphysical doubt" and must instead come forward with "specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In this district, parties briefing a motion for summary judgment must comply with Local Civil Rule 56.1 ("Rule 56.1"), which requires each party to, *inter alia*, annex to their moving papers a list of material facts, supported by citations to admissible evidence, that the party contends are not in genuine dispute. *See* Local Civ. R. 56.1. As the Second Circuit has explained, the purpose of Rule 56.1 is "to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Rule 56.1 statements are not "vehicle[s] for making factual assertions that are otherwise unsupported in the record." *Id.* The reviewing court must disregard Rule 56.1 assertions that are not supported by the record or are based on evidence that would not be admissible at trial. *Ringel v. Cnty. of Nassau*, No. 18-CV-1930, 2021 WL 4316715, at *2 (E.D.N.Y. Sept. 22, 2021).

In an employment discrimination case, "the function of the court on a motion for summary judgment . . . 'is to determine whether the proffered admissible evidence shows

circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Bonaffini v. City Univ. of New York*, 751 F. Supp. 3d 67, 73–74 (E.D.N.Y. 2024) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995)). The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "At the same time, [the Second Circuit has] also made it clear that the salutary purposes of summary judgment—avoiding protracted and harassing trials—apply no less to discrimination cases than to other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (internal quotation marks omitted and alterations adopted).

## DISCUSSION

### I.    Discrimination Claims

Plaintiff brings discrimination claims under Title VII, Section 1981, and the NYSHRL. All three claims "are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973)." *Tolbert*, 790 F.3d at 434. Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation marks omitted). If the plaintiff can establish a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors" and "[t]he burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory

reason' for the disparate treatment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *McDonnell Douglas,* 411 U.S. at 802). If a defendant can articulate a legitimate reason, the burden shifts back to the plaintiff to prove that the proffered reason was pretextual. *Id.* A plaintiff may establish a *prima facie* case of race discrimination "by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). To make such a showing, the plaintiff must demonstrate that he "was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citation and internal quotation marks omitted).

Defendants do not appear to dispute the first two prongs of the *McDonnell Douglas* framework: (1) that plaintiff is a member of a protected class as a Black, Muslim man and (2) that plaintiff was qualified for his position as a tenured professor of Anthropology. Defendants do, however, contest prongs three and four and contend that (3) the actions complained of do not constitute "adverse employment actions" and (4) the surrounding circumstances do not give rise to an inference of discriminatory intent. (MSJ at 8–9).

### A. Adverse Employment Actions

In the context of a discrimination claim under the *McDonnell Douglas* framework, an "adverse employment action" is defined as a "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citation omitted). The Second Circuit has instructed that:

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished

material responsibilities, or other indices unique to a particular situation.

*Id.* (citation omitted).  However, "the Second Circuit . . . [has] made clear that many negative personnel actions taken by employers do not constitute adverse employment actions sufficient to establish a prima facie case of employment discrimination." *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89 (S.D.N.Y. 2022) (collecting cases). For example, reasonable enforcement of "preexisting disciplinary policies . . . without more, does not constitute adverse employment action."  *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).

Here, plaintiff alleges that Defendants discriminated against him through the following actions:

1. the revocation of plaintiff's appointment and/or tentative designation to serve as Acting Chair during the 2019-2020 school year (Compl. ¶¶ 71–73);

2. Berliner's decision not to reappoint plaintiff as an Honors College Mentor for the 2019-2020 school year (*id.* at ¶¶ 74–76);

3. the filing of Grievance Committee charges against plaintiff (*id.* at ¶¶ 87–90);

4. the Grievance Committee procedures and outcome (*id.* at ¶¶ 90–92);

5. the decision not to appoint plaintiff to the Search Committee (*id.* at ¶¶ 101–104); and

6. the timeline and process by which plaintiff became department chair (*id.* at ¶¶ 94–99).

(*see id.* ¶¶ 143; Pl.'s Opp'n at 7–22).  Only half of these actions are cognizable as adverse employment actions.

The first and second allegations concerning plaintiff's role as Acting Chair and Honors College Mentor do constitute adverse employment actions because they reflect

material changes in plaintiff's title, workplace responsibilities and compensation. (Compl. ¶¶ 73 & 75.) *See Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir.2008). Notwithstanding the short duration of the restrictions (*see* MSJ at 12–14), these actions cannot be described as "trivial," *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 288 (S.D.N.Y. 2013), since they effectively reduced plaintiff's salary and restricted him from accessing certain professional opportunities for at least an entire school year. *See Buon v. Spindler*, 65 F.4th 64, 80 (2d Cir. 2023) ("[D]enial of a workplace opportunity that materially affects the terms and conditions of employment, can constitute an adverse employment action.") The sixth allegation is also an adverse employment action insofar as it concerns a denial of promotion to the position of Department Chair. *Id.* ("[I]t is well settled that failing to promote an employee can constitute a significant change in employment status that is tangible and thereby qualifies as an adverse employment action under Title VII." (citation and internal quotation marks omitted)).

Plaintiff's third allegation concerning the filing of Grievance Committee charges against him does not constitute an adverse employment action because it merely reflects the initiation of a reasonable and preexisting conflict resolution procedure set forth in the CBA. (*See* DSOF ¶¶ 35–39; Berliner Decl. 14.) *Joseph*, 465 F.3d at 91 ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."). Under those procedures, the filing of charges triggers a review by an independent committee of faculty to assess whether there is "adequate cause" for discipline; the filing does not itself constitute disciplinary action. (Berliner Decl., Ex. 14.) The initiation of such a review, without more, cannot be considered a material change in the conditions of employment. *See Cintron v. Atticus Bakery, LLC*, 242 F. Supp. 3d 94,

102 (D. Conn. 2017) (finding that employer's "investigation of [employee's conduct]" was a "reasonable response to information that had been presented to the [employer]" and did not constitute an adverse employment action); *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004) ("[T]he request for an investigation by an independent body (as opposed to the disciplinary action that may follow) does not constitute an actionable adverse employment action.").

Likewise, plaintiff's fourth allegation concerning the outcome of the Grievance Committee investigation does not constitute an adverse employment action because there is no evidence to support plaintiff's assertions that the process was irregular, or the outcome was unreasonable. (*See* Pl.'s Opp'n at 19–20.) As to the process, it is undisputed that plaintiff was represented by counsel, and was permitted to testify, submit written documentation, and cross-examine the individual Students that testified. (PSOF ¶¶ 40–47.) As to the outcome, the only disciplinary action recommended by the Grievance Committee was (1) a written warning and (2) an apology. (*Id*. ¶ 49.) "Verbal and written warnings generally do not constitute adverse employment actions unless they lead to more substantial employment actions that are adverse." *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 306 (N.D.N.Y. 2013); *see also Chang v. Safe Horizons*, 254 F. App'x 838 (2d Cir. 2007). Nor, in my view, can a mandatory private apology to the Students—the only action that was required of plaintiff to resolve the Grievance Committee process—be considered an adverse employment event. (*See* DSOF ¶¶ 50–51.)

Finally, plaintiff's fifth allegation concerning the Search Committee does not constitute an adverse employment action because there is no evidence that his exclusion from the committee materially impacted the conditions of his employment. Courts in this Circuit have routinely found that removal from a university committee, without more, is

18

not sufficiently significant to constitute an adverse employment action. *See Hamada v. State Univ. of New York at Farmingdale*, No. 23-CV-6786, 2025 WL 916899, at *3 (E.D.N.Y. Mar. 25, 2025) (collecting cases); *Watkins v. City of Waterbury Bd. of Educ.*, No. 19-CV-00593, 2022 WL 3347218, at *16 (D. Conn. Aug. 12, 2022) (same). Here, plaintiff was never appointed to the Search Committee in the first place, which means that his allegation of adverse impact is even weaker. *See Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 399-400 (S.D.N.Y. 2008) (holding that defendant's failure to "invite[] [plaintiff] to be a member of [a] Search Committee . . . do[es] not have the hallmarks of adverse employment actions"). On the record before me, I simply cannot conclude that the denial of the occasion to serve in a relatively minor role "to which [he] was not absolutely entitled" had a materially adverse on his conditions of employment. *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 217 (E.D.N.Y. 2001).

## B. Inference of Discrimination

Considering the three allegations that I have identified as potential adverse employment actions, I next assess whether a reasonable jury could conclude that any of them "occurred under circumstances giving rise to an inference of discriminatory intent." *Tolbert*, 790 F.3d at 435.

Turning first to the two temporary measures that were implemented during the Grievance Committee process, I find that plaintiff has not met his *prima facie* burden to demonstrate an inference of discrimination. Plaintiff's argument, in sum, is that Defendants denied him "the benefit of the doubt" and implemented restrictions more hastily than they would have for a white professor accused of similarly serious misconduct. (Pl.'s Opp'n at 10, 19.) In the absence of direct evidence of discriminatory intent, plaintiff seeks establish an inference of discrimination by comparing his treatment

to that of other faculty accused of misconduct. (Pl.'s Opp'n at 8–14.)  *See Levy v. Legal Aid Soc'y*, 408 F. Supp. 3d 209, 214 (E.D.N.Y. 2019) (explaining that "indirect evidence" of discrimination may include "evidence that similarly situated comparators outside of Plaintiff's protected class were treated more favorably than Plaintiff").

With respect to the temporary measures imposed prior to the completion of the Grievance Committee, plaintiff draws comparisons between himself and seven other faculty members who, he argues, were afforded greater leeway in the face of similar accusations.  (See Opp'n at 7–14.)  For the following reasons, I find that none of plaintiff's proposed comparators were "similarly situated in all material respects[.]"  *Graham*, 230 F.3d at 39 (citation omitted).

Profs. 13 and 15—both white women who supervised Hofstra students on study abroad trips—are dissimilar because there is no evidence that either of them were accused of acting in a manner that compromised student safety.  (See DSOF ¶¶ 82–83.)  The fact that both Prof. 13 and Prof. 15 evidently supervised trips during which a *student* willfully engaged in unsafe behavior does not render them comparable.  In plaintiff's case, *he* was the one accused of creating an unsafe situation.  (PSOF ¶¶ 82–83.)  Similarly, Profs. 5 and 10 are not similarly situated because the conduct of which they were accused—yelling at a student (Prof. 5) and presenting distressing historical images in the classroom without sufficient warning (Prof. 10)—was indisputably less serious than the allegations against plaintiff and did not implicate student safety.  (*See id*. ¶ 97.)  Insofar as Profs. 5, 10, 13, or 15 were accused of "misconduct," it was not sufficiently similar to plaintiff's case to render them proper comparators.  *Bogle v. Connecticut Dep't of Mental Health & Addiction Servs.*, No. 3:23-CV-323, 2025 WL 1786072, at *6 (D. Conn. June 27, 2025) ("In cases involving allegations of disparate treatment in workplace disciplinary

proceedings, a comparator's underlying misconduct must be substantially similar to that of the plaintiff in all material respects[.]").

Profs. 6 and 9 are improper comparators because the accusations of racist speech against them were uncorroborated and were not the subject of student complaints to Defendants.  (DSOF ¶¶ 8, 101.)  Many of the facts surrounding plaintiff's alleged misconduct, by contrast, are undisputed.  (*See* PSOF ¶¶ 12–22 (admitting, *inter alia*, that Students expressed concern "about every aspect of the trip;" that a Student's mother emailed Hofstra to express concern about student safety; and that Students reported that they did not feel comfortable communicating with plaintiff.)  Regardless of whether plaintiff was actually responsible for any misconduct, the fact that he was the subject of student and parent complaints "clearly distinguishes [him] from other employees who were not[.]"  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 495 (2d Cir. 2010).

The closest proposed comparator is Prof. 3, who was accused of conduct that I would deem similarly serious that was also reported to Defendants.  Nonetheless, plaintiff's comparison cannot establish an inference of discrimination because there is no evidence that Prof. 3 faced less serious discipline.  To the contrary, the record establishes that Prof. 3 was prohibited from becoming the chair of his department—a role he was presumed to fill imminently–for several years and was prohibited from teaching certain courses.[1]  (DSOF ¶ 40.)  While such restrictions are not identical to the temporary measures imposed on plaintiff, they are certainly not less serious.  The most significant

---

[1] There is no evidence that Prof. 3 was allowed to retain other appointments or responsibilities analogous to those from which Daniels was temporarily suspended.  Plaintiff's statement to the contrary (*see* Pl.'s Opp'n at 9) is unsupported by the record.

differences that I can discern are the fact that the restrictions imposed on Prof. 3 were not communicated in writing. (*See* PSOF ¶ 95.) Defendants have provided a credible non-discriminatory explanation for that difference—namely that Prof. 3 voluntarily agreed to the restrictions after admitting to his misconduct. (DSOF ¶ 95.) In sum, because Prof. 3 faced discipline that was similarly serious to the discipline faced by plaintiff, the comparison between plaintiff and Prof. 3 does not support an inference of discrimination.

Turning next to plaintiff's allegations about the delay in his appointment as Department Chair (Compl. ¶¶ 96–97, 143), I find that plaintiff has not met his *prima facie* burden to demonstrate an inference of discrimination. Plaintiff has not identified any direct evidence of discrimination, such as verbal remarks from Hofstra administrators. *See Levy*, 408 F. Supp. 3d at 214. Nor has he offered indirect evidence through comparators.

In sum, because there is no evidence from which a reasonable jury could infer that any of the challenged actions were animated by discriminatory intent, Defendants' motion for summary judgment is granted as to the discrimination claims.

## II.    Retaliation Claims

### A.  Legal Standard

Plaintiff brings retaliation claims under Title VII, Section 1981, and NYSHRL. (Compl. ¶¶ 147–49, 156–58; 163–65.) Retaliation claims under these three statues are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Littlejohn*, 795 F.3d at 315-16 (standard for Title VII and Section 1981); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (standard for NYHRL retaliation claims). "To make out a prima facie case of retaliation, a plaintiff must make four showings: that (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took

adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* (citation and internal quotation marks omitted).  The definition of "adverse employment action" is "more relaxed in the retaliation context" than it is in the disparate treatment context, *Henderson v. City of New York*, 818 F. Supp. 2d 573, 582 (E.D.N.Y. 2011), and requires the plaintiff to show that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, (2006)); *see also Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("Title VII's anti-discrimination and anti-retaliation provisions are not coterminous; anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harm.")  "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Hicks*, 593 F.3d at 165 (citation and internal quotation marks omitted).

### B. Retaliation for August 15, 2019 Memo

Here, Defendants do not dispute that the submission of plaintiff's August 15, 2019 memo alleging violations of Hofstra's Freedom from Discrimination Policy by the Students (*see* Berliner Decl. Ex. 13, ECF No. 95-39) constitutes a "protected activity." (Compl. ¶¶ 77, 80; *see* MSJ at 24.)

Plaintiff has not met his burden to establish a *prima facie* case that any of Defendants' subsequent actions were acts in retaliation for the memo.  As a threshold matter, I agree with Defendants that the termination of plaintiff's appointments as

Honors College Mentor and Acting Chair in 2019 cannot serve as a basis for a retaliation claim because both decisions predated the protected activity.  (*See* MSJ at 24.)  I also find that Berliner's filing of charges with the Grievance Committee approximately six weeks later cannot constitute a basis for a retaliation claim because it merely triggered a third-party investigation.  "The Second Circuit . . . [has] generally held that the initiation of [] an internal investigation . . . may constitute a materially adverse action only 'if it results in a hostile work environment, constructive discharge, or other employment consequences of a negative nature, or if conducted in such an egregious manner as to dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Robinson v. De Niro*, 739 F. Supp. 3d 33, 97 (S.D.N.Y. 2023) (quoting *Tillery v. New York State Off. of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 27 (2d Cir. 2018)); *see also Cox v. Onondaga Cnty. Sheriff's Dep't,* 760 F.3d 139, 146 (2d Cir. 2014).  As previously discussed, there is no evidence that the Grievance Committee's process was particularly burdensome and there was no meaningful discipline imposed as a result. Furthermore, Defendants' subsequent actions related to the Search Committee and the Department Chair occurred too far after August 15, 2019 to establish a causal connection to plaintiff's written complaint.  *See Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 284 (E.D.N.Y. 2013) (explaining that courts generally measure the outer temporal for inferring causation "in months") (collecting cases).

### C.  Retaliation for May 24, 2021 Initiation of Litigation

In his opposition papers, plaintiff argues that several of Defendants' 2021 actions were undertaken in retaliation for the initiation of this lawsuit, which was filed on May 24, 2021.  (Pl.'s Opp'n at 23.)  Defendants do not contest that the lawsuit was a protected activity and seem to concede that actions that postdate May 24, 2021 could, in theory,

24

provide a basis for a retaliation claim. (*See* Def.'s Reply at 10.)  While the Complaint does not specifically address events that postdate its filing and plaintiff did not move to amend, members of Hofstra's administration could have anticipated the lawsuit before it was officially filed due to, *inter alia*, plaintiff's filing of an EEOC complaint.  (Compl. ¶ 22.) *See Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 313-15 (S.D.N.Y. 2016) (finding sufficient causal connection between protected activity and alleged retaliatory acts by analyzing acts leading up to the filing of a lawsuit, including letter sent by plaintiff's lawyer to defendant).  Further, evidence adduced in discovery and discussed below strongly suggests that Defendants were aware of the impending litigation when they made several decisions that predated May 24, 2021.  (*See* Compl. ¶¶ 97, 103.)  I therefore consider plaintiff's retaliation claims to encompass actions allegedly taken in response to the initiation of his lawsuit, insofar as they are "part and parcel of the other claims contained in [the Complaint.]"  *Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 284 (D. Conn. 2009) (discussing exception to exhaustion requirement where alleged retaliation occurs because the employee files an administrative charge or lawsuit).

Plaintiff points to two actions that occurred in close temporal proximity to the filing of his Complaint: his non-selection for the Search Committee and the decision to appoint an external chair to lead the Anthropology Department for the 2021–22 school year.  (Pl.'s Opp'n at 23–24.)  While I agree with Defendants that the non-selection for the Search Committee alone would not amount to an adverse employment action, *see Ruggieri*, 146 F. Supp. 2d at 217, I must consider it alongside plaintiff's alleged deprivation of the opportunity to serve as a department chair.  *See Hicks*, 593 F.3d at 165. Viewed through that lens, Defendants' combined actions rise to the level of material adversity as a reasonable worker may be dissuaded from making or supporting a similar

charge of discrimination. *Id.* Evidence adduced in discovery suggests plaintiff's anticipated filing of this lawsuit may have played a causal role in both decisions. (PSOF ¶¶ 77, 155; *see* Maduegbuna Decl. Exs. R & X, ECF Nos. 96-20, 96-26.) Drawing all inferences in plaintiff's favor as the nonmoving party, I find that plaintiff has established a *prima facie* case of retaliation.

Defendants seek to overcome plaintiff's *prima facie* showing by pointing to a legitimate, nonretaliatory reason for the decision to appoint an external chair—namely that doing so was justified by concerns about budget and department size. (Def.'s Reply at 10.) That explanation sounds persuasive at first blush but is not clearly supported by admissible evidence concerning Hofstra's sizeable budget or historical practices surrounding small departments. (*See* PSOF ¶¶ 61–66; Maduegbuna Decl. Ex. X, ECF No. 96-26.) Reviewing the materials underlying the parties' Rule 56.1 statements, I agree with plaintiff that a reasonable factfinder could rationally find Defendants' proffered rationale unworthy of credence. *See Siuzdak v. Sessions*, 295 F. Supp. 3d 77, 105 (D. Conn. 2018) ("Pretext may also be shown by way of weaknesses, implausibilities, inconsistencies, or contradictions in Defendant's proffered legitimate, nonretaliatory reasons for Defendant's action . . . [F]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.") (alterations adopted and citation omitted)).

Therefore, I find that there is a genuine dispute of material fact as to whether plaintiff's initiation of litigation was the but-for cause of Defendants' delay in appointing him Department Chair.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to plaintiff's discrimination claims.  The motion is GRANTED with respect to plaintiff's retaliation claims as they concern the August 15, 2019 memo and is DENIED with respect to plaintiff's retaliation claims as they concern conduct that occurred after Defendants became aware of plaintiff's intent to file the instant lawsuit. SO ORDERED.


_____/s/_____
Allyne R. Ross
United States District Judge


Dated:          September 30, 2025
                Brooklyn, New York